```
IN THE UNITED STATES DISTRICT COURT
  FOR THE DISTRICT OF SOUTH CAROLINA
          SPARTANBURG DIVISION
```

| | |
|---|---|
| Shaneka Sharday Flournoy, ) | |
|    Plaintiff, ) | Case No 7:12-cv-2792-TMC-JDA |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | **OF MAGISTRATE JUDGE** |
| Spartanburg Regional Medical Center,[1] ) | |
|    Defendant. ) | |

This matter is before the Court on a motion for summary judgment filed by Defendant [Doc. 35], and a motion for summary judgment filed by Plaintiff [Doc. 40]. This action alleges a claim for race discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").[2] [Doc. 1-1.] Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

Plaintiff filed this action on September 25, 2012, [Doc. 1], and Defendant filed an answer on November 5, 2012 [Doc. 20]. Defendant filed its motion for summary judgment on May 6, 2013. [Doc. 35.] On May 7, 2013, the Court issued an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the summary judgment/dismissal procedure and of the possible consequences if she failed to adequately respond to the motion. [Doc. 38.] Plaintiff filed her own motion for summary judgment on May 8, 2013, [Doc. 40], to which Defendant responded on May 22, 2013,[Doc. 44].

---

[1] Defendant actually does business as Spartanburg Regional Health Services District, Inc. but has proceeded under the case caption articulated by Plaintiff. [Doc. 35-1 at 1.]

[2] It is undisputed that Plaintiff timely filed an EEOC charge, received her right to sue letter, and filed this action within the "right to sue" period. [Doc. 1-1.]

Because Plaintiff failed to respond to Defendant's motion and out of an abundance of caution, the Court issued an order on August 14, 2013, to allow Plaintiff until September 3, 2013, to file a response to Defendant's motion for summary judgment in the event that she did not intend for her motion to also be construed as her response. [Doc. 55.] The Court advised Plaintiff that if she failed to file any further pleadings, the Court would consider her motion for summary judgment to also be her response to Defendant's motion. [*Id.*] Plaintiff failed to file any further pleadings. Accordingly, the motions are now ripe for review.

## **BACKGROUND**

Plaintiff was hired by Defendant in September 2009 to work on an as-needed basis ("PRN status") in Defendant's Behavioral Health Unit as a Patient Care Associate. [Doc. 35-3 at 18:5–7; Doc. 35-2 ¶ 5] Plaintiff was supervised by Amy Davis, R.N. ("Davis"), who was the Interim Manager of the Behavioral Health Unit from October 2009 to May 2012. [Doc. 35-2, ¶¶ 1, 4]. Davis is now the Manager of the Behavioral Health Unit and has been since May 2012. [*Id.*] Davis testified that Plaintiff began having problems with tardiness as soon as she began working for Defendant. [*Id.* ¶ 6.] Plaintiff received a written warning in April 2010 after Plaintiff was late for work 35 times. [*Id.*; Doc. 35-2 at 11.] Davis verbally warned Plaintiff about her tardiness twice, in October 2009 and on February 24, 2010, before issuing her the written warning.[3] [*Id.*] Plaintiff stated she had no comment on the written warning and refused to sign it. [*Id.*] Plaintiff did admit that she was warned in her

---

[3] Plaintiff testified in her deposition that she did not remember the disciplinary action for her tardiness. [Doc. 35-3 at 19:17–18.] She testified that Davis did discuss with Plaintiff that she needed to be clocked in fifteen minutes before her shift but that Davis also told her "to keep doing what you're doing. I'm not going to hold that against you." [*Id.* at 21:5–15.]

annual review that she had been tardy nineteen times *since* the initial written warning of her untimeliness. [Doc. 40-1 at 16.]

Davis began to have difficulty reaching Plaintiff in May 2010 when trying to contact Plaintiff to schedule her for work shifts. [Doc. 35-2 ¶ 7.] On May 12, 2010, Davis sent Plaintiff an email reviewing the times Davis tried to contact Plaintiff and requesting that Plaintiff send Davis additional contact information. [*Id.*; Doc. 35-2 at 13.] Davis specifically stated to Plaintiff in the email that she had a need for upcoming shifts and inquired whether Plaintiff would be interested in covering them. [*Id.*] She asked Plaintiff to contact her immediately about the shifts. [*Id.*] Plaintiff failed to respond to Davis until May 20, 2010. [*Id.* ¶ 8.] Plaintiff admitted that she could check her work email from home on a daily basis. [Doc. 35-3 at 26:4–6.] In her return email to Davis, Plaintiff claimed to have attempted to contact Davis several times. [Doc. 35-2 ¶ 8.] Davis responded to Plaintiff the same day and stated she had not received any messages from Plaintiff, but gave Plaintiff her cell phone number so Plaintiff could contact her directly. [*Id.*] Plaintiff also claims she approached Allison Cooke, a charge nurse, for work on two occasions and was told the unit did not have any needs. [Doc. 40-1 at 1.]

Also in May 2010, Plaintiff began calling Defendant's General Resource Pool ("Resource Pool") to volunteer to work shifts throughout the hospital, rather than in the Behavioral Health Unit. [Doc. 35-2 ¶ 9.] Plaintiff did so though she admitted that she was assigned to the Behavioral Health Unit. [Doc. 35-3 at 12:23]. This created staffing problems for Davis. [Doc. 35-2 ¶ 10.] Plaintiff testified that she would always call Davis first before calling the Resource Pool and that she called the Resource Pool because Davis

3

was not assigning Plaintiff shifts. [Doc. 35-3 at 77:25–78:5.] Davis wrote an email to the other nursing managers using the Resource Pool and requested that they ensure Plaintiff was checking with the Behavioral Health Unit to see if the unit had any needs before she received shifts elsewhere. [Doc. 40-1 at 24.] Barbara Tuscan, another nursing manager, spoke to Plaintiff on June 4, 2010, when Plaintiff called the General Resource Pool to request a shift. [*Id.* at 17.] Plaintiff had not called the Behavioral Health Unit to find out if they had any staffing needs, and told Tuscan that Davis would have called her if any help was needed. [*Id.*]

On September 29, 2010, Plaintiff was working in another unit and called the nursing supervisor, Mabel Gray ("Gray"), and told her she needed to leave her shift early because of an emergency. [Doc. 35-2 ¶ 11.] Gray asked Plaintiff to remain for an additional ten minutes until she could be replaced. [*Id.*] Plaintiff refused, and Gray told Plaintiff to leave. [*Id.*] Gray, who is African-American, issued Plaintiff a written warning after the incident for unsatisfactory work performance, rudeness, and inappropriate conduct. [*Id.* ¶ 12; Doc. 35-2 at 15.] Plaintiff again had no comment and refused to sign the warning. [*Id.*] Plaintiff appealed the warning to the director of the Behavioral Health Unit, Roy Mastroantonio, [Doc. 35-3 at 35-38], but after his review and a meeting with Plaintiff and Defendant's Human Resources representative, he upheld the warning. [*Id*. at 39.]

On February 7, 2011, Davis wrote Plaintiff a letter explaining that she and Allison Cooke ("Cooke"), a charge nurse in the Behavioral Health Unit, made multiple attempts to contact Plaintiff about her work schedule. [Doc. 35-2 at 17.] Plaintiff's cell phone message box was full and her home phone had been disconnected. [*Id.*] As of that date,

4

Plaintiff had not met the requirements to maintain her PRN status. [*Id.*] Plaintiff was instructed to contact Davis by no later than February 16, 2011; otherwise, Defendant would conclude that she had voluntarily resigned her position. [*Id.*] Davis gave Plaintiff two contact numbers. [*Id.*] Davis sent the letter via certified mail. [*Id.*] Plaintiff never contacted Davis. [*Id.* ¶ 13.] Davis testified that had Plaintiff contacted her, she would have given Plaintiff numerous shifts in the Behavioral Health Unit. [*Id.* ¶ 14.] Davis did not believe she could have been more diligent than she was in offering Plaintiff shifts. [*Id.*] Davis states that Plaintiff was not terminated but voluntarily resigned because she did not respond to Davis' letter and therefore abandoned her job. [*Id.* ¶¶ 13, 15.] Plaintiff avers that she never received the letter, but testified that she was living at the address where the letter was sent in February 2011. [Doc. 35-3 at 80:17–22.] The postal service attempted delivery twice and then returned the letter to Defendant on February 23, 2011. [Doc. 35-3 at 40-41.]

Plaintiff alleges she was discriminated against when Amanda Thomas ("Thomas"), a white employee, was awarded a full-time first-shift position in the Behavioral Health Unit. [Doc. 35-2 ¶ 16.] Plaintiff also applied for the position and testified that Davis promised her a full-time position. [Doc. 35-3 at 31:11–32:4.] Davis attested that she selected Thomas for the position because Thomas had been employed with Defendant longer than Plaintiff and Thomas did not have any disciplinary actions against her, unlike Plaintiff, who had two disciplinary actions. [Doc. 35-2 ¶ 16.] Plaintiff is not aware of Thomas' qualifications. [Doc. 35-3 at 79:1–11.] Plaintiff acknowledges that Davis encouraged Plaintiff to apply for the full-time position that was available on the night shift, which Thomas held before she

5

was selected for the day shift, but Plaintiff declined to apply. [Doc. 35-3 at 33:19–25.] Plaintiff also testified that she was discriminated against because she was denied hours when she requested to work. [*Id*. at 60:1–3]. Plaintiff stated she worked approximately fifty hours a week, but some of those hours were through the Resource Pool rather than the Behavioral Health Unit. [*Id.* at 19–22.] Plaintiff testified that Davis never said anything of a racially discriminating nature to her. [*Id.* at 42:16–18.] Plaintiff further attested that Davis did not discriminate against Plaintiff when she began working on the unit, but only "when things didn't start going her way," which was after Plaintiff declined to apply for the night shift. [*Id*. at 63:14–25.] During Plaintiff's tenure in the Behavioral Health Unit, there were eight African-American employees working in the unit; there are currently ten black employees working under Davis on the unit. [Doc. 35-2 ¶ 15.][4]

## APPLICABLE LAW

**Liberal Construction of Pro Se Pleadings**

Plaintiff brought this action pro se, which requires the Court to liberally construe her pleadings. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978). Pro se pleadings are held to a less stringent standard than those drafted by attorneys. *Haines*, 404 U.S. at 520. However, a court may not construct the complainant's legal arguments for her. *Small v. Endicott*, 998 F.2d 411, 417–18 (7th Cir. 1993). Nor should the court "conjure up questions never squarely presented." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

---

[4] The Court gives no credence to Plaintiff's unfounded claims that Defendant tampered with evidence or that Defendant's counsel harassed Plaintiff and any potential counsel she contacted. [Doc. 40-1.] Plaintiff fails to put forth any evidence to support these claims. Additionally, Defendant's counsel submitted an affidavit under oath and as an officer of this Court to refute these allegations. [Doc. 44-1.]

**Summary Judgment Standard**

> Rule 56 states, as to a party who has moved for summary judgment:
>
> > The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id*. at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in her pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id*. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp*., 759 F.2d 355, 365 (4th Cir.1985), *overruled on other grounds*, 490 U.S. 228 (1989). "Only disputes over

7

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, she must produce existence of a factual dispute on every element essential to her action that she bears the burden of adducing at a trial on the merits.

## **DISCUSSION**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In 1991, Congress amended Title VII to include that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id*. § 2000e-2(m).

8

As the United States Court of Appeals for the Fourth Circuit has explained in the wake of *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), a Title VII plaintiff may "avert summary judgment . . . through two avenues of proof." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). First, a plaintiff may survive a motion for summary judgment "by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor . . . motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). The Fourth Circuit defines "direct evidence" as evidence that the employer "announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor . . . ." *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982) (citing *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1113 (4th Cir. 1981)). In other words, direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995), *abrogated on other grounds by Desert Palace*, 539 U.S. 90. Circumstantial evidence may "includ[e] but [is] not limited to proof of the claimant's general qualifications, from which the inference of . . . discrimination may rationally be drawn independently of any presumption [of discrimination]." *Cline*, 689 F.2d at 485 (footnote omitted). To demonstrate an unlawful employment practice in these so-called mixed-motive cases, a plaintiff "need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence," that the impermissible factor was a motivating factor, i.e., "direct evidence of discrimination is not required in mixed-motive cases." *Desert Palace*, 539 U.S. at 101–02.

Alternatively, a plaintiff may proceed under the *McDonnell Douglas* "pretext" framework. *Diamond*, 416 F.3d at 318 (quoting *Hill*, 354 F.3d at 285). Under this framework, an employee must first prove a prima facie case of discrimination.[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff succeeds, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* By providing such an explanation, the employer rebuts the presumption of discrimination created by the prima facie case, and "[t]he presumption, having fulfilled its role of forcing the [employer] to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). If the employer articulates a legitimate, nondiscriminatory reason, the burden shifts back to the employee to show that the articulated reason was actually a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804.

However, the Fourth Circuit has emphasized that, "[r]egardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive

---

[5] To establish a prima facie case of race discrimination for termination, the plaintiff must present facts showing that (1) she is a member of a protected class; (2) she experienced an adverse employment action; (3) she was qualified for her job position and her job performance was satisfactory; and (4) the position remained open or was filled by a similarly situated individual outside of the protected class. *Hill*, 354 F.3d at 285; *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) (citing *Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 133, 133 n.7 (4th Cir. 2002); *Karpel v. Inova Health Sys. Serv.*, 134 F.3d 1222, 1228 (4th Cir. 1998)).

The Court notes that Plaintiff's claims could fairly be read as a failure-to-promote claim when she did not receive her requested hours and the full-time day shift position. To state a prima facie case for failure to promote, a plaintiff must show that "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for the position, and (4) the defendant rejected her application under circumstances that give rise to an inference of discrimination." *Williams v. Giant Food Inc.*, 370 Fl3d 423, 430 (4th Cir. 2004).

theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill*, 354 F.3d at 286 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)). Further, the court stated,

> To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that "the protected trait . . . actually motivated the employer's decision." *Reeves*, 530 U.S. at 141, 120 S.Ct. 2097 (internal quotation marks omitted). The protected trait "must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Id.* (internal quotation marks and alterations omitted); *cf. Price Waterhouse* [*v. Hopkins*], 490 U.S. [228,] 277, 109 S. Ct. 1775 (O'Connor, J., concurring) (noting that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden" of proving discrimination); *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 678 (7th Cir. 2002) (noting that the pertinent inquiry is whether the decisionmaker, as opposed to other managers or subordinates, evaluated the aggrieved employee based upon discriminatory criteria).

*Id.* Thus, whether a plaintiff proceeds under the first or second avenue of proof, the plaintiff's ultimate burden is to demonstrate the employer's adverse employment action was motivated, at least in part, by discrimination.

11

In this case, Plaintiff must rely on the *McDonnell Douglas* burden-shifting scheme[6] to establish her case of discrimination. Plaintiff admits that she has no evidence of direct discrimination.[7] [Doc. 35-3 at 42:16–18.] Plaintiff has also failed to put forth any circumstantial evidence of discrimination. Plaintiff admits that she did receive at least one of the disciplinary actions, even if she claims she does not recall the other. And Plaintiff's own evidence demonstrates that she was in fact aware of the disciplinary action for her tardiness because during her review, Davis warned her that she had been tardy an additional nineteen times since that written warning. Moreover, Plaintiff put forth no evidence, beyond her own self-serving testimony, to contradict Davis' testimony and record evidence that Davis contacted Plaintiff repeatedly to attempt to assign Plaintiff shifts in the Behavioral Health Unit. The only evidence Plaintiff puts forth of her own qualifications is a recognition she received in January 2010 for Plaintiff's care of one specific patient. [Doc.

---

[6] One court within the Fourth Circuit has noted, "[t]he relevance of the *McDonnell Douglas* scheme outside of the trial context is limited." *Lerner v. Shinseki*, No. ELH-10-1109, 2011 WL 2414967, at *14 (D. Md. June 10, 2011). The Fourth Circuit has observed:

> Notwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of "the ultimate question of discrimination vel non." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983). As the Supreme Court has explained, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Thus, "[c]ourts must . . . resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of 'the ultimate question of discrimination vel non.'" *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (citation omitted).

*Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294–95 (4th Cir. 2010) (alteration in original).

[7] The only mention Plaintiff makes of evidence of direct discrimination is when she testified that "Gloria Davis overheard Amy Davis making a racial statement towards Alveeto who was the social worker made a statement stating that she was going to hang her out to dry." [Doc. 35-3 at 47:12–16.] As this statement does not concern Plaintiff's employment and is clearly hearsay, the Court has not considered it as evidence of direct discrimination.

1-6.] Plaintiff admits that Davis encouraged Plaintiff to apply for a full-time position in the Behavioral Health Unit but Plaintiff decided against doing so. [Doc. 35-3 at 33:19–25.] She also states that she did not believe Davis discriminated against her until after she decided not to apply for the full-time position [*id.* at 63:14–25], and acknowledged that there were several other black employees on the unit. Plaintiff has not demonstrated that her race was a motivating factor in the decision-making process of either assigning shifts or selecting the candidate for the full-time day shift position. The Court concludes that Plaintiff has failed to present either direct or circumstantial evidence of discrimination and thus turns to the pretext analysis.

Plaintiff cannot meet her prima facie burden under *McDonnell Douglas* because she has failed to present facts that would establish that her job performance was satisfactory, that she was meeting her employer's legitimate expectations or that she was qualified for the position.[8] Defendant has presented record evidence that Plaintiff was consistently tardy and that she had two disciplinary actions filed against her–one for her lateness and the other for her attitude toward Gray. Plaintiff admits that she was often late, though she testified that Davis told her not to worry about it, and that she was written up for rudeness by Gray. Plaintiff's own proffered evidence refutes her claim that Davis was not concerned about the tardiness, as Plaintiff was warned during her review about her continued untimeliness. Plaintiff has provided no evidence to suggest the expectations of Defendant

---

[8] For purposes of this analysis, the Court will presume that Plaintiff has established the first two elements of a prima facie case—she is a member of a protected class and viewing the facts in the light most favorable to the Plaintiff, the Court will accept that she experienced an adverse job action when she was not selected for the full time position, did not receive the hours as she claimed and was terminated (though Defendant maintains she voluntarily resigned). *See Honor*, 383 F.3d at 188. Moreover, in proceeding under the failure to promote analysis, Plaintiff is a member of a protected group and applied for the full-time day shift position.

were not legitimate.[9] As the Fourth Circuit has clarified, it is the perception of the decision maker—not the self-assessment of the plaintiff—that is relevant in determining satisfactory job performance. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). Therefore, Plaintiff has failed to meet the third prong of her prima facie case.

Plaintiff also cannot meet the fourth prong of the analysis and show that Thomas was similarly qualified for the position or that choosing Thomas over Plaintiff gives rise to an inference of discrimination. As discussed above, Plaintiff put forth minimal evidence of her own qualifications. Additionally, Plaintiff admits that she does not know of Thomas' qualifications. Davis testified that Thomas had been at the hospital longer than Plaintiff and had no disciplinary history. Therefore, the Court finds that Plaintiff cannot meet her the fourth section of her prima facie case.

Even assuming that Plaintiff could meet her prima facie case, Defendant has articulated a legitimate, non-discriminatory reason that Plaintiff was not given more hours in the unit and that she was not promoted—she had two disciplinary charges against her, Thomas had more experience than Plaintiff and thus was selected for the full time position, and Davis had difficulty getting in touch with Plaintiff to schedule her for her hours. Plaintiff has failed to point to any evidence to demonstrate that these given reasons are pretext for

---

[9]As recently summarized by another court in this District,

> An employer's expectations of its employees are "legitimate" when they are honestly held; whether the employee agrees with those expectations is not the test. In this context, the term "legitimate" means that expectations cannot be a "sham designed to hide the employer's discriminatory purpose." As long as the requirements imposed are bona fide expectations, it is not the court's province to determine whether an employer demands too much of its workers.

*Thompson v. Harvest Hope Food Bank*, No. 3:10-2003-MBS-PJG, 2012 WL 591672 (D.S.C. Jan. 17, 2012) (citations omitted), *report and recommendation adopted by* 2012 WL 590812 (D.S.C. Feb. 23, 2012).

discrimination. She admits that she was tardy, though claims she did not recall receiving a disciplinary warning for her tardiness, and that she was disciplined for her rude behavior toward Gray. She acknowledges that she is unaware of Thomas' educational background, employment history, or other qualifications that factored into Defendant's decision to place Thomas in the full-time position on the unit. Finally, while she claims that she tried to get in touch with Davis, Plaintiff has no evidence other than her self-serving testimony on the matter to overcome both Davis' testimony and the record evidence that Davis and others on the unit tried consistently to contact Plaintiff to schedule her for shifts but Plaintiff failed to answer or respond back to them. Therefore, Plaintiff has not demonstrated that Defendant's legitimate reasons are pretext for discrimination.

**RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that Defendant's motion for summary judgment be GRANTED and Plaintiff's motion be DENIED.

IT IS SO RECOMMENDED.

s/ Jacquelyn D. Austin<br>United States Magistrate Judge

September 30, 2013
Greenville, South Carolina